**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-23792-BLOOM/Elfenbein**

PIERRE REGINALD BOULOS,

     Plaintiff,

v.

DIRECTOR, U.S. DHS ICE ERO
MIAMI FIELD OFFICE, ACTING DIRECTOR,
US DHS ICE, US ATTORNEY GENERAL, ACTING
DIRECTOR EOIR, and U.S. SECRETARY OF STATE,

     Defendant.

_____/

## ORDER ON PLAINTIFF'S MOTION FOR RECONSIDERATION

**THIS CAUSE** is before the Court upon Petitioner Pierre Reginald Boulos' ("Petitioner")

Motion to Reconsider Court's Order Re Petitioner's Expedited Motions for Temporary Restraining

Order and Preliminary Injunction ("Motion" or "Motion for Reconsideration"), ECF No. [44]. The

Court has reviewed the Motion, the related submissions, and is otherwise fully advised. For the

reasons that follow, Plaintiff's Motion for Reconsideration is granted in part and denied in part.

## I.    BACKGROUND

Petitioner "is a U.S.-born,[1] 69-year-old senior citizen" who is detained by U.S.

Immigration and Customs Enforcement ("ICE") at the Krome Service Processing Center

("Krome"). ECF No. [31] at 2. In June 2025, "U.S. Secretary of State Marco Rubio determined

that [Petitioner] is a deportable alien under INA § 237(a)(4)(C) (8 U.S.C. [§] 1227(a)(4)(C))." ECF

No. [16] at 4. Secretary Rubio concluded that Petitioner "engaged in a campaign of violence, gang

---

[1] Boulos was born in the State of New York in 1956. *See* ECF No. [16] at 3.

support, and trafficking weapons and drugs that has contributed to the destabilization of Haiti," and therefore, "allowing Petitioner to remain in the United States undermines U.S. foreign policy interest in stabilizing Haiti and the region[.]" *Id.* As a result of Secretary Rubio's determination, "HSI Miami and ERO Miami arrested Petitioner to initiate removal proceedings" and detained him at Krome. ECF No. [31] at 6; ECF No. [16] at 4.[2] "On July 18, 2025, the Department of Homeland Security ("DHS") initiated removal proceedings against [Petitioner], charging him as removable under 8 U.S.C. §§ 1227(a)(4)(C)(i) (the Foreign Policy Ground) and 1227(a)(1)(A)[.]" ECF No. [31] at 7.

On July 31, 2025, an immigration judge entered an order denying Petitioner's motion for release on bond, finding that he could not review the Government's detention decision under 8 C.F.R. § 1003.19(h)(2)(i)(C). ECF No. [31] at 7. On October 13, 2025, "[Petitioner] filed a Renewed Motion for Custody Redetermination in light of new evidence[.]" *Id.* at 8. However, the immigration judge declined to release Petitioner from custody; as a result, Petitioner remains detained at Krome, and the removal proceedings remain ongoing.

On August 22, 2025, Petitioner filed a Complaint and Writ of Habeas Corpus before this Court claiming that his detention by ICE is unlawful. ECF No. [1] In relevant part, he argued that he has been detained pursuant to an *ultra vires* regulation. Petitioner maintained he was detained pursuant to 8 C.F.R. § 1003.19(h)(2)(i)(C), which he argued "subjects anyone charged under the Foreign Policy Ground to mandatory detention." ECF No. [31] at 17. Petitioner contended that this detention provision is "incompatible with the Immigration and Nationality Act" and, therefore, he is entitled to an individualized bond hearing where the immigration judge may consider his flight risk and danger to the community. *Id.* Because Petitioner contended that he is "neither a flight risk

---

[2] The Government states that Boulos was placed in removal proceedings pursuant to an issuance of a Notice to Appear ("NTA"). ECF No. [16] at 4.

nor a danger to the community," he argued that an individualized bond assessment would entitle him to pretrial release while the removal proceedings continue. *Id.* at 19.

In November 2025, Petitioner brought his Expedited Motion for Temporary Restraining Order and Motion for Preliminary Injunction. ECF No. [31]. In that Motion, Petitioner argued that his immediate release was appropriate because (1) the Court had jurisdiction and authority to immediately release him under 28 U.S.C. § 2241, (2) he was likely to succeed on the merits because he remained a United States citizen and his detention was based on an *ultra vires* regulation, (3) he would suffer irreparable harm in the absence of emergency relief because he suffers from wet macular degeneration, which if left untreated, leads to permanent blindness, and (4) because the harm of leaving him detained far outweighed any harm to the Government if he were to be released. *See generally id.*

On December 12, 2025, the Court denied that Motion. ECF No. [37]. In relevant part, the Court found that Petitioner was unlikely to succeed on the merits because the Court did not "find that 8 C.F.R. § 1003.19(h)(2)(i)(C) exceeds the authority set out in § 1226(a), as the regulation falls within the Attorney General's discretionary authority regarding the detention of aliens charged under § 1227(a)(4)(C)." ECF No. [37] at 19. The Court referred to the decision in *Barajas Farias v. Garland*, which approved of § 1003.19(h) as a proper exercise of the Attorney General's discretion. *Id.* (citing No. 24-CV-4366 (MJD/LIB), 2024 WL 6070211, at *2 (D. Minn. Dec. 4, 2024)). Moreover, the Court found that "§ 1003.19(h)(2)(i)(C) does not mandate detention but instead constrains the immigration judge's review of the agency's actions." *Id.* at 20.

On January 22, 2026, Petitioner filed the instant Motion seeking reconsideration of the part of the Court's December 12, 2025 Order addressing 8 C.F.R. § 1003.19(h)(2)(i)(C). ECF No. [44]. In the Motion, he essentially argues that the Court's ruling "allows a regulation to override the

3

plain language and purpose of § 1226(a), through which Congress intended to provide those detained under it with an individualized custody determination, in contrast to those subject to the mandatory detention scheme set forth in § 1226(c), and it cannot be squared with settled canons of statutory construction." *Id.* at 2.

## II.   LEGAL STANDARD

A motion for reconsideration is "an extraordinary remedy to be employed sparingly." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002). "The burden is upon the movant to establish the extraordinary circumstances supporting reconsideration." *Saint Croix Club of Naples, Inc. v. QBE Ins. Corp.*, No. 2:07-cv-00468-JLQ, 2009 WL 10670066, at *1 (M.D. Fla. June 15, 2009) (citing *Taylor Woodrow Constr. Corp. v. Sarasota/Manatee Airport Auth.*, 814 F. Supp. 1072, 1073 (M.D. Fla. 1993)).

> A motion for reconsideration must do two things. First, it must demonstrate some reason why the court should reconsider its prior decision. Second, it must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision. Courts have distilled three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice.

*Cover v. Wal-Mart Stores, Inc.*, 148 F.R.D. 294, 295 (M.D. Fla. 1993) (citations omitted). "Such problems rarely arise and the motion to reconsider should be equally rare." *Burger King Corp.*, 181 F. Supp. 2d at 1369.

Because court opinions "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure," a motion for reconsideration must clearly "set forth facts or law of a strongly convincing nature to demonstrate to the Court the reason to reverse its prior decision." *Am. Ass'n of People With Disabilities v. Hood*, 278 F. Supp. 2d 1337, 1339, 1340 (M.D. Fla. 2003) (citations omitted). As such, a court will not reconsider its prior ruling without a showing of "clear and obvious error where the 'interests of justice' demand correction." *Bhogaita*

*v. Altamonte Heights Condo. Ass'n, Inc.*, No. 6:11-cv-1637-Orl-31, 2013 WL 425827, at \*1 (M.D. Fla. Feb. 4, 2013) (quoting *Am. Home Assurance Co. v. Glenn Estess & Assoc.*, 763 F.2d 1237, 1239 (11th Cir. 1985)). "When issues have been carefully considered and decisions rendered, the only reason which should commend reconsideration of that decision is a change in the factual or legal underpinning upon which the decision was based." *Taylor Woodrow Constr. Corp.*, 814 F. Supp. at 1072-73; *see also Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1247 n.2 (S.D. Ala. 2008) (noting that reconsideration motions are to be used sparingly, and stating, "imagine how a district court's workload would multiply if it w[ere] obliged to rule twice on the same arguments by the same party upon request").

A motion for reconsideration "is not an opportunity for the moving party . . . to instruct the court on how the court 'could have done it better' the first time." *Hood v. Perdue*, 300 F. App'x 699, 700 (11th Cir. 2008) (citation omitted). Thus, a motion to reconsider is "appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Kapila v. Grant Thornton, LLP*, No. 14-61194-CIV, 2017 WL 3638199, at \*1 (S.D. Fla. Aug. 23, 2017) (quoting *Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) (internal quotation marks omitted). "Such problems rarely arise and the motion to reconsider should be equally rare." *Burger King Corp.*, 181 F. Supp. 2d at 1369. Ultimately, reconsideration is a decision that is "left 'to the sound discretion' of the reviewing judge." *Arch Specialty Ins. Co. v. BP Inv. Partners, LLC*, No. 6:18-cv-1149-Orl-78DCI, 2020 WL 5534280, at \*2 (M.D. Fla. Apr. 1, 2020) (quoting *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993)).

## III.    DISCUSSION

### A.  Likelihood of Success on the Merits—Ultra Vires Argument

Petitioner argues that he he has demonstrated a likelihood of success on the merits because the regulation denying him a bond hearing is ultra vires. ECF No. [44] at 2. He explains that § 1226 establishes a detention scheme pursuant to which there are two main categories of detentions. *Id.* at 3. The first category, established by § 1226(a), represents the "default rule," and pursuant to that rule, detainees are eligible for a bond hearing. *Id*. Indeed, courts—including the Supreme Court—have held that § 1226(a) *entitles* detainees to a bond hearing. *Id.* (collecting cases). The second category, established by 1226(c), is designed for particular cases and subjects detainees that fall into that category to mandatory detention. *Id*.

Petitioner argues that the regulation under which he is being detained—8 C.F.R. § 1003.19(h)(2)(i)(C)—is incongruent with § 1226. *Id.* at 4. He points to cases in which it has been held that § 1003.19(h) is ultra vires because it "effectively mandates detention for a broader set of crimes than the ones Congress categorically and narrowly specified in § 1226(c)." *Id*. (citing *Torosyan v. Nielsen*, 2018 WL 5784708, at *7 (C.D. Cal. Sept. 27, 2018)). The case cited by the Court, Petitioner says, relied on a Supreme Court case "that interpreted a materially different statute and, importantly, a harmonious regulatory scheme." *Id.* (citing *Barajas Farias*, 2024 WL 6070211 at *2). That is, unlike here, the regulation that the underlying Supreme Court case interpreted was consistent with and authorized by the underlying statute. *Id.* at 5. By contrast, the statute at issue here—§ 1226—"clearly enumerates a list of offenses for which detention is mandatory," and the regulation seeks to expand that list. *Id*.

Moreover, Petitioner argues that the Court's interpretation of § 1226(a) would render that statutory provision superfluous. *Id*. Specifically, if DHS can expand the list of individuals subject to mandatory detention under § 1226(c) without limit and beyond the categories Congress

specifically delineated, then § 1226(c) would not be an exception at all, and 1226(a) would be superfluous. *Id*. "Substantive canons of statutory interpretation require the Court to presume that Congress intentionally excluded § 1227(a)(4)(C) from the universe of conduct triggering mandatory detention in § 1226(c)." *Id*. In essence, Petitioner argues that Congress intended not to subject people like him to mandatory detention, and DHS took it upon itself to "declare otherwise through 8 C.F.R. § 1003.19(h)(2)(i)(C)." *Id*.

In addition, Petitioner argues that the Court's reasoning provides no limiting principle on DHS' detention authority. *Id.* at 6. If DHS' discretion allows it to add new categories to the mandatory detention provision, nothing would stop it from adding *all* aliens to that mandatory detention provision, "effectively eliminating bond hearings altogether and vesting DHS with unchecked authority." *Id*. This cannot have been Congress' intention in enacting § 1226(a). "Simply put, it could not be Congress' intent to confer unlimited discretion on DHS; instead, Congress made clear that noncitizens who fall outside the ambit of § 1226(c) are entitled to an individualized bond hearing." *Id.* (citation omitted).

In its Response, Respondents argue that Petitioner is merely attempting to "rehash[]" his old arguments and relitigate old matters. ECF No. [47] at 4. They argue that a motion for reconsideration cannot be used to do either of these things. *Id*.

Petitioner replies that its Motion for Reconsideration is limited and only asks the Court to "(1) reconsider and revise its finding that the regulation under which [Petitioner] has been mandatorily detained, 8 C.F.R. § 1003.19(h)(2)(i)(C), is not ultra vires; and (2) set a bond hearing or, alternatively, issue an order directing an immigration judge ('IJ') to do so." ECF No. [50] at 1. Petitioner points out that, while his ultra vires argument is not new, Respondents have never addressed it on the merits. *Id*. at 1–2. Fundamentally, the Court's ruling on this narrow issue

"constitutes a clear error that has resulted in a manifest injustice: [Petitioner's] continued unlawful detention without a bond hearing." *Id.* at 2. Rather than rehashing old issues, Petitioner insists the Motion argues that the Court made an erroneous decision "by singularly relying on a flawed, unpublished, out-of-circuit ruling" that stands in contrast to the "growing chorus" of Eleventh Circuit courts agreeing with Petitioner's interpretation of the § 1226 statutory scheme. *Id.*

Specifically, Petitioner points out that the Court's Order was the first time the *Barajas Farias* case was mentioned, so Petitioner did not have a chance to respond to its "misconceived reasoning" until now. *Id.* at 3. Moreover, since the Court's Order, other courts within the Eleventh Circuit have issued opinions supporting Petitioner's interpretation of § 1226 and its mandatory detention provision, and these opinions were not available at the time the Court issued its order. *Id.* at 4 (citation omitted).

Petitioner reiterates that the Court's reliance on *Barajas Farias* was misplaced and constituted clear error. *Id.* That case relied on the Supreme Court's decision in *Lopez v. Davis*, 531 U.S. 230 (2001), to approve of 1003.19(h)(2)(i)(C), but *Lopez* interpreted a "*materially different statute and, unlike here, a harmonious regulatory scheme.*" *Id.* (emphasis in original). But here, § 1226(a) authorizes a bond hearing as the default for detained noncitizens, while § 1226(c) details the list of excepted noncitizens who are mandatorily detained. *Id.* at 5. The statute "actually defines the offenses for which detention is mandatory, such that Respondents cannot then supplement that with a regulation claiming a different, unenumerated offense warrants mandatory detention." *Id.* Accordingly, it was clear error for the Court to rely on *Barajas Farias*.

Moreover, recent decisions within the Eleventh Circuit have adopted Petitioner's interpretation. *Id.* at 6 (collecting cases). These cases confirm that because "Congress conferred the discretion to release noncitizens detained under § 1226(a) and enumerated exceptions in §

1226(c), the Executive Branch cannot read its own categorical exceptions from bond eligibility into the statute." *Id.* at 7.

The Court agrees with Petitioner that reconsideration is warranted and, further, that Petitioner has shown a likelihood of success on the merits. A plain review of the text of § 1226 makes clear that noncitizens generally fall into the bond-eligible provision at § 1226(a) "[e]xcept as provided in subsection (c)."  8 U.S.C. § 1226(a). Subsection 1226(c) enumerates the specific classes of individuals subject to mandatory detention. These classes include, *inter alia*, those deportable by reason of having committing offenses described in § 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D). 8 U.S.C. § 1226(c). Notably absent from that list is any mention of those deemed deportable under 1227(a)(4)(C), *see id.*, the statute under which Petitioner has been found deportable. ECF No. [16] at 4.

But 8 C.F.R. § 1003.19(h)(2)(i)(C), the implementing regulation of 1226(c), purports to— in effect—add new classes of individuals subject to mandatory detention under 1226(c) by making their conditions of custody unreviewable by an immigration judge. 8 C.F.R. § 1003.19(h)(2)(i)(C). Those new classes of individuals include those who fall under § 1227(a)(4)(C)—namely, those whose presence in the United States would have "potentially serious adverse foreign policy consequences." 8 U.S.C. § 1227(a)(4)(C).

As Petitioner points out, this cannot be correct. Indeed, several Courts have adopted the view that the regulation and statute are incongruent and that the regulation is invalid insofar as it conflicts with an express statutory grant of authority by Congress. *See, e.g., Torosyan v. Nielsen*, No. 2:18-CV-5873-PSG (SK), 2018 WL 5784708, at *7 (C.D. Cal. Sept. 27, 2018) (finding petitioner had shown a likelihood of success on the merits on his claim challenging § 1003.19 as incompatible with § 1226), *report and recommendation adopted*, No. 218CV5873PSGSK, 2018

WL 6167918 (C.D. Cal. Oct. 26, 2018); *Zavala v. Ridge*, 310 F. Supp. 2d 1071, 1079 (N.D. Cal. 2004) (invalidating 8 C.F.R. § 1003.19(i)(2) because it "effectively eliminates the discretionary nature of the immigration judge's determination and results in a mandatory detention . . . of a new class of aliens, although Congress has specified that such individuals are not subject to mandatory detention"); *Ashley v. Ridge*, 288 F. Supp. 2d 662, 673 (D. N.J. 2003) ("If Congress wanted to make detention mandatory for all aliens who have committed crimes, it would not have devised the present bifurcated system in which mandatory detention is imposed only on a limited class of aliens[.]").

The Court agrees with this majority of courts that § 1003.19 likely conflicts with § 1226 based on the text, structure, and context of the statute. As an initial matter, nothing in § 1226(c) suggests that its list of mandatorily detainable offenses is "illustrative only." *Torosyan*, 2018 WL 5784708, at *7. Similarly, nothing in § 1226(a) suggests that DHS may, by agency regulation, expand the list of aliens subject to mandatory detention beyond those listed in § 1226(c)(1). By contrast, the plain text of § 1226(a) is clear that it creates "two different categories of aliens"— those who *may* be detained and are entitled to a bond hearing and those who *must* be detained and are to receive no bond hearing. *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018). "Simply put, subsection (a) sets forth the general rule while subsection (c) sets forth the exceptions to that general rule." *Torosyan*, 2018 WL 5784708, at *8. Congress did not leave a gap to be filled; it explicitly enumerated the § 1226(c) exceptions. And "[w]hen Congress provides exceptions in a statute" in this way, "[t]he proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *Toor v. Lynch*, 789 F.3d 1055, 1061 (9th Cir. 2015); *see United States v. Brockamp*, 519 U.S. 347, 352 (1997) ("explicit listing of

exceptions, taken together," suggests that "Congress did not intend courts to read other unmentioned, open-ended" exceptions into the statute).

Moreover, the canons of statutory interpretation support Petitioner's reading. One such canon of construction is that where Congress includes particular language in one section of a statute but excludes it in another, Congress did so intentionally. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotations and citations omitted). While Congress included in § 1226(c) those deportable for having committed an offense covered by § 1227(a)(2), it did not include those found deportable under its neighboring provision, § 1227(a)(4)(C). That is a legislative choice. That is, it strikes the Court as the only logical conclusion that Congress knew it could include both provisions but chose not to do so.

*Barajas Farias* does not change the Court's reasoning here. The court in that case found that "Congress decided that some detainees should not be released pending the removal proceedings. [] Rather than decide what to do with the other detainees, Congress left the decision to the Attorney General." *Barajas Farias*, 2024 WL 6074470, at *3. That reading is inconsistent with the statute for the reasons described above. *Lopez* does not compel a different result. In that case, underlying the statute said that a federal inmate convicted of a *nonviolent offense* who completed a substance abuse program *may* have his sentence reduced. *Lopez*, 531 U.S. at 233 (citing 18 U.S.C. § 3621(e)(2)(B)). The Bureau of Prisons published a rule to implement the statute, and that rule categorically banned those convicted of possession of a firearm from receiving the sentence reduction benefit. *Id.* at 234. The Supreme Court found that the statute gave the Bureau of Prisons "discretion to delineate, as an additional category of ineligible inmates, those

11

whose current offense is a felony involving a firearm." *Id.* at 238 (citing 28 CFR § 550.58(a)(1)(vi)(B)). It focused on the fact the use of the word "may" as opposed to "shall." *Id.* at 240–41. It found that Congress had not delineated circumstances in which the Bureau of Prisons "either must grant the reduction, or is forbidden to do so." *Id.* at 242. The same cannot be said here. Section 1226(a) used the permissive language of "may," but § 1226(c) used the language of "shall." 8 U.S.C. § 1226. That means Congress specifically instructed that DHS "must" detain certain individuals, and it would be incongruent with the statute for Congress to have delineated certain offenses warranting mandatory detention with the intent that DHS could add more to the list—at least not without saying so.

In light of the above, Petitioner has shown a likelihood of success on the merits. The Court therefore turns to the remaining factors applicable to a preliminary injunction.

## B. Likelihood of Irreparable Harm

As a general matter, even if a petitioner shows a substantial likelihood of success on the merits, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Brown v. Azar*, 497 F. Supp. 3d 1270, 1292 (N.D. Ga. 2020). "[T]he harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits." *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1366 (S.D. Ga. 2018) (quoting *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983)). The asserted irreparable harm must be "neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

Petitioner argues that he will suffer irreparable harm in the absence of preliminary relief. ECF No. [31] at 19. Indeed, he argues that "the harm is likely, actual, and not only imminent but ongoing." *Id.* at 20. The harm includes constitutional injury from the deprivation of his rights. *Id.* It also includes physical harm. Specifically, Petitioner suffers from macular degeneration, a disease

12

which can ultimately lead to permanent blindness. *Id*. He represents that he suffered injury to his eye as a result of the "botched injection" he received while in detention; indeed, he "has not fully recovered vision" in the affected eye. *Id*. No amount of monetary damages or later medical intervention can restore Petitioner's eyesight. *Id.* (citation omitted).

Respondents do not directly contest Petitioner's claims regarding irreparable harm. ECF No. [35]. Instead, they argue that his preliminary injunction motion seeks the same relief sought in his habeas petition; it goes beyond preserving the status quo, which is the purpose of preliminary injunctions. *Id.* at 8. "Injunctive relief to obtain resolution of the ultimate issues presented in the complaint is not appropriate." *Id.* (citations omitted). They also largely interpret his irreparable harm claims as challenging his conditions of confinement, which is not properly accomplished through a habeas petition. *Id.* at 7. Instead, the proper way to bring such a charge is through a *Bivens* action. *Id.* (citations omitted).

Petitioner replies that Respondents mischaracterize his irreparable harm evidence as a condition-of-confinement challenge. ECF No. [36] at 8. But Petitioner is not arguing that his conditions of confinement warrant his release; instead, his release is warranted, in relevant part, "because the regulation under which he has been mandatorily detained is ultra vires." *Id.* at 9. He only references "potentially irreversible vision loss" as a factor establishing irreparable harm and justifying injunctive relief. *Id.* Courts are entitled to consider conditions of confinement in their irreparable harm analyses, regardless of whether a habeas petition is an appropriate vehicle for challenging conditions of confinement. *Id.* (citations omitted).

The Court agrees with Petitioner and finds that he has established that he will suffer the irreparable harm of an increased likelihood of severe illness if a preliminary injunction is not entered. Petitioner's macular degeneration can ultimately lead to permanent blindness. ECF No.

[31] at 20. It goes undisputed that he suffered injury to his eye as a result of the "botched injection" received while in detention and "has not fully recovered vision" in the affected eye. *Id*. An increased risk of medical complications constitutes irreparable harm. *See, e.g., Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."); *W. Alabama Women's Ctr. v. Miller*, 217 F. Supp. 3d 1313, 1334 (M.D. Ala. 2016) (recognizing that increased risk of medical complications constitutes irreparable harm); *Unknown Parties v. Johnson*, 2016 WL 8188563, at *15 (D. Ariz. No. 18, 2016), *aff'd sub nom Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017) (finding evidence of "medical risks associated with . . . being exposed to communicable diseases" adequate to establish irreparable harm); *Ambrosi v. Warden, Folkston Ice Processing Ctr.*, No. 5:25-CV-13, 2025 WL 2779210, at *4 (S.D. Ga. Aug. 18, 2025), *report and recommendation adopted*, No. 5:25-CV-13, 2025 WL 2772500 (S.D. Ga. Sept. 29, 2025) (finding that "health concerns and avowed lack of proper medical care" could support a finding of irreparable injury). Moreover, Petitioner has established the irreparable harm associated with potentially wrongful detention. *See, e.g., Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (recognizing "the irreparable harms imposed on anyone subject to immigration detention (or other forms of imprisonment)"). This is sufficient to support a preliminary injunction.

### C.  Balance of Equities and Public Interest

Where the government is the opposing party, balancing of the equities and the public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Thus, the Court asks whether any significant "public consequences" would result from issuing the preliminary injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Harm to the public is significantly more difficult to find where the government's action is likely unconstitutional. *See Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013) (finding harm to the

state was "more ephemeral" where it sought enforcement of a statute that was "very likely" unconstitutional).

Petitioner asserts that his constitutional right to be free from wrongful detention weighs heavily in this case. ECF No. [31] at 21. Moreover, Petitioner contends that "Respondents maintain an interest in *preventing* the unlawful detention of U.S. citizens at taxpayer expense, and the public interest is served when the government is compelled to respect limits imposed by the Constitution." *Id*. The harms to Petitioner, as relevant here, also include "irreparable vision loss, as well as exposure to severe physical and psychological harm, and potentially other consequences." *Id*. Respondents, Petitioner argues, cannot claim a public interest in continuing agency action that violates the law. *Id*. (collecting cases).

Respondents argue that Petitioner's contention "presuppose[es] that Petitioner's detention is ultra vires." ECF No. [35] at 10. Instead, they contend that the Court should recognize the Government's "strong interest in enforcement of its immigration laws as it interprets them." *Id.* (collecting cases). Respondents also have an interest in "preventing detained aliens from absconding and ensuring that they appear for removal." *Id.* (collecting cases). Moreover, the government interests are particularly strong where "foreign policy and national security intersect." *Id.* (collecting cases).

Petitioner's Reply takes issue with Respondents' argument regarding the government interest in preventing absconding. ECF No. [36] at 11. Respondents, he says, made no attempt to consider whether Petitioner "*actually poses* a risk of flight," making it unreasonable to argue an interest in preventing absconding here. *Id*. An assessment of Petitioner would show his deep ties to the United States and to citizen family members. *Id*. Moreover, Respondents' asserted interest in the intersection of foreign policy and national security falls flat when Respondents made no

15

claim that "national security interests compelled or motivated [Petitioner's] detention." *Id.* at 12. Indeed, the ground of deportability applicable to Petitioner refers only to "foreign policy," so it is unclear why Respondents raise arguments about any intersection with national security. *Id.*

The Court agrees with Petitioner. Respondents' appeal to the government's interest in enforcing immigration laws is a generalized concern that always exists for government agencies; it adds little to the hardship analysis. Moreover, as Petitioner rightly notes, there is no valid government interest in enforcing a likely invalid regulation. "And nothing in a preliminary injunction would impair the agency's ability to detain Petitioner on other grounds, if there is a material change in circumstances suggesting Petitioner's risk of flight or danger to the community." *Torosyan*, 2018 WL 5784708, at *9 (citations omitted). As the record stands now, there is no indication—and, indeed, Respondents advance no argument—that Petitioner is a flight risk with his myriad connections to the United States and United States citizen relatives. So, fundamentally, there is no indication that granting Petitioner a bond hearing would impede the Government's ability to enforce its immigration laws.

Moreover, Respondents' stated interest in the intersection of foreign policy and national security is vague and without supporting content. It is not clear to the Court how offering Petitioner a bond hearing jeopardizes national security or even foreign policy, since it does not alter the actual removal proceedings but merely could allow Petitioner to be released during the pendency of these proceedings. Merely invoking the term "national security" without explaining its relevance here does not create an impenetrable shield.

By contrast, Petitioner's interests—in not being wrongly detained, in obtaining proper medical care for his eye condition, and in being reunited with his family—are well-developed and weighty. And ultimately, the Court finds that Respondents' own interests, as well as the interests

16

of the public, are best "served by addressing a potential conflict between an agency regulation and a congressional statute over the scope of immigration detention." *Torosyan*, 2018 WL 5784708, at *9. Moreover, "the potentially needless detention of an alien who may be legally entitled to bail would impose an unnecessary cost on the public fisc." *Id*. Thus, the Court finds that the balance of the equities and public interest tip in favor of Petitioner. For all these reasons, the Court will grant Petitioner's motion for a preliminary injunction, but will not order Petitioner's immediate release. Instead, the Court will order that Petitioner receive the bond hearing to which he is entitled under § 1226(a).

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.   Plaintiffs' Motion for Reconsideration, **ECF No. [44]**, is **GRANTED in part and denied in part**.

2. Within seven (7) days of the date of this Order, Respondents must either: (1) provide Petitioner with a bond hearing before an immigration judge consistent with 8 U.S.C. § 1226(a), at which the Government shall bear the burden of justifying his continued detention by clear and convincing evidence of dangerous or risk of flight; or (2) release Petitioner from custody, under reasonable conditions of supervision.

3. Respondents are enjoined from denying bond to Petitioner on the basis that he is detained pursuant to 8 U.S.C. § 1226(c) or 8 C.F.R. § 1003.19(h)(2)(i)(C).

4. Respondents must, within 24 hours of the bond hearing, file a status report indicating the outcome of the bond hearing and, if release on bond is denied, the reason(s) for the denial.

Case No. 25-cv-23792-BLOOM/Elfenbein

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 1, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record